UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 24-61 (JRT/ECW)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) GOVERNMENT'S TRIAL BRIEF |
| ANDREW DAVID MUNSINGER, | ) |
| Defendant. | ) |

I. Introduction

The United States of America, by and through its undersigned attorneys, hereby respectfully submits its trial brief. Trial is scheduled to begin on March 31, 2025. The defendant is charged by Indictment with one count of being a felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (Count 1), one count of being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (Count 2), and one count of possession of marihuana[1] with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D) (Count 3), all allegedly occurring on or about February 7, 2024.

The charges arise from a nearly year's-long FBI investigation of the defendant, through the use of a Confidential Human Source ("CHS") (between approximately February 2023 and January 2024) who interacted with the defendant on multiple occasions, which were audio- and/or video-recorded using FBI clandestine recording devices. On two occasions, in September 2023 and January 2024, the CHS met the

---

[1] The United States used the spelling specified in the Title 21 statute.

defendant in Minnesota, and they went to a gun range near the defendant's home, for which the defendant had a membership, and to where the defendant brought his ammunition and personally made semi-automatic rifles and shot the firearms. On various occasions, the recordings capture the defendant admitting to having a prior felony conviction and serving more than one year in prison, admitting to owning and possessing ammunition and firearms, purchasing and handling ammunition, loading ammunition into personally made firearms, shooting those firearms, discussing his trafficking and sale of marijuana, and possessing over five pounds of marijuana.

On February 7, 2024, the FBI executed search warrants at the defendant's residence in Redwood Falls, Minnesota, at a farm property associated with the defendant in Lake Lillian, Minnesota, and on vehicles owned by the defendant, and seized five firearms, including the two personally made semi-automatic rifles, two shotguns, and a nine-millimeter pistol, hundreds of rounds and casings of ammunition, multiple high-capacity magazines, a tactical bullet-resistant vest, approximately five pounds of heat-sealed packaged marijuana, a marijuana grow operation, and $24,300 cash in $100-bill denominations. A federal grand jury returned the Indictment in the present case on March 6, 2024. (ECF 14)

## II. Factual Overview

In February 2023, a paid FBI confidential human source ("CHS") first met the defendant at a "meet-and-greet" function of the Aryan Freedom Network organization ("AFN"). AFN is a national white-supremacist organization.[2] The CHS joined AFN

---

[2] The United States does not plan to elicit any racist or other derogatory statements or references made by the defendant to the CHS during the investigation.

2

in his capacity as an FBI informant and not because of his personal beliefs in white nationalism or supremacy. The CHS had been an AFN member since 2022 and participated in event coordination and recruitment, but did not recruit the defendant to join AFN.



As a newer member, the defendant introduced himself at the AFN meeting as "Thor" from the Saint Cloud, MN area, expressed a strong interest in firearms, stated that he owned firearms, and admitted that he had a felony conviction. During the AFN meet-and-greet, members discussed upcoming meetings and trainings, including an upcoming firearms training. The defendant expressed interest in the firearms training event and asked what firearms he could bring to the training. The defendant also allegedly asked whether he could bring "boom," which the CHS believed was a reference to explosives.

The CHS reported what he learned to the FBI and identified the defendant from a photograph shown to the CHS by an FBI agent. As part of the investigation, the FBI installed a pole cam near the exterior of the defendant's residence in Redwood Falls, Minnesota.

In April 2023, the defendant and the CHS attended the AFN firearms training event in Indiana. The defendant drove his Chevrolet Silverado to the event, and he brought his personally made AR-10 rifle with a scope in a black rifle case, rifle magazines, and ammunition. When the AFN leader learned that the defendant was in possession of a firearm at the event, she reprimanded the defendant and told him

he could not possess a firearm at the AFN event because he was a felon. The firearms training was then terminated.

In May 2023, the defendant attended another AFN event with the CHS. The CHS wore an audio-recording device provided by the FBI during the event and recorded his interactions with the defendant. During the event, the defendant detailed attending an annual summer gun show in Minnesota and shooting firearms at the gun show.

In June 2023, the defendant traveled to attend another AFN event, which the CHS also attended and again wore an audio-recording device provided by the FBI, which recorded his interactions with the defendant. During the event, the defendant told the CHS that he owns guns but generally does not keep his guns, money, and drugs together at the same location, implying that he feared police raiding his house.

During a recorded phone call with the CHS in mid-September 2023, the defendant and the CHS arranged to meet in Redwood Falls, Minnesota, to go shoot firearms together at a gun range where the defendant had a membership. The defendant stated he would bring his personally made AR-10 rifle to the range and that the defendant had .308-caliber ammunition for the AR-10.

On September 16, 2023, the CHS traveled to the defendant's residence in Redwood Falls, Minnesota, to meet the defendant to go shooting at the range. The CHS wore audio- and video-recording devices provided by the FBI. The defendant drove to the gun range in his Silverado and brought his personally made AR-10 rifle in the black case along with .308-caliber ammunition. The CHS recognized the AR-

4

10 rifle and case as the same rifle and case the defendant brought to the AFN firearms training event in April 2023. The defendant loaded his rifle magazine with ammunition and shot his AR-10 rifle at the range, which was recorded by the CHS.



In early December 2023, the defendant and the CHS met in person at a local bar in Minnesota. The CHS wore an audio-recording device provided by the FBI. During the meeting, the defendant discussed his trafficking and sale of marijuana and told the CHS that the defendant owned a Winchester shotgun.

During another recorded phone call in January 2024, the CHS and the defendant arranged to meet again on January 27, 2024, to shoot firearms at the same range in Redwood Falls, Minnesota. The defendant told CHS that he planned to bring the AR-15 rifle he built to go shooting.

On January 27, 2024, prior to meeting the CHS to go shooting, federal agents conducting physical surveillance observed the defendant travel to a farm in the Lake Lillian area of Minnesota, where the defendant remained for a few minutes, before returning to his residence in Redwood Falls, Minnesota. On January 27, 2024, the CHS traveled to the defendant's residence in Redwood Falls, Minnesota and met the defendant to go shooting at the range. The CHS wore an audio- and video-recording device provided by the FBI. Before going to the range, the defendant and the CHS stopped at River Valley Arms, where the defendant purchased 5.56-caliber

5

ammunition for his AR-15 rifle. The defendant and the CHS then traveled to the same range that they went to in September 2023 to go shooting.

The defendant brought his personally made AR-10 rifle and AR-15 rifle as well as the ammunition he purchased at River Valley Arms. The AR-15 was equipped with a mounted scope. The defendant loaded magazines with ammunition for both rifles and shot both rifles at the range. While at the range  the defendant also discussed  his trafficking and sale of marijuana with the CHS, told the CHS that he had built close to 100 guns, and admitted that he could not lawfully own a gun.

After shooting at the range, the defendant and the CHS eventually drove back to the defendant's residence, where the defendant invited the CHS into the defendant's residence. While in the defendant's residence, the defendant showed the CHS and counted out six heat-sealed packages, each containing approximately one-pound of marijuana, from a blue tote and explained how much the defendant profits from his sale and trafficking of marijuana. 

6

On February 7, 2024, the FBI executed search warrants at the defendant's residence in Redwood Falls, Minnesota, at the Lake Lillian farm property (where FBI surveilled the defendant travel to before going shooting with the CHS), and on vehicles owned by the defendant. In a Jeep Liberty vehicle registered to the defendant at the Lake Lillian farm, the FBI recovered two shotguns, a box for a rifle scope, mailings addressed to the defendant at his Redwood Falls residence, and ammunition. At the defendant's Redwood Falls residence, the FBI recovered the AR-10 and AR-15 personally made rifles in the black rifle cases, several loaded and empty high-capacity rifle magazines, 17 boxes of live ammunition, hundreds of various rounds and casings of ammunition, the six heat-sealed bags of marijuana (weighing approximately 5.5 pounds), two additional heat-sealed bags of marijuana, evidence of a hydroponic marijuana grow operation, a Ruger 9mm firearm in a Glock case with three loaded 9mm magazines, a tactical bullet-resistant vest, a laptop computer, and over $24,000 cash (in $100 bill denominations).




### III. Expected Evidence

A. Testimony

The United States will offer the testimony of the CHS who met and interacted with the defendant on several occasions, recorded those interactions and admissions, and observed the defendant in possession of marijuana, ammunition, and the personally made rifles. The government will also offer the testimony of FBI agents who conducted surveillance of the defendant's vehicle, and who conducted the searches and seizures from the defendant's residence, the Lake Lillian farm, and the defendant's vehicles. The United States will also offer expert testimony of various expert witnesses as further described below.[3] The government will also offer the testimony of the case agent regarding the overall investigation, the GPS tracker maps of the defendant's vehicle's travels on January 27, February 2, and February 3, 2024, business records obtained from the Runnings and River Valley Arms gun stores, and pole cam footage and still shots of the defendant outside his residence. An FBI analyst who used the GPS tracker data of the tracker on the defendant's vehicle will also testify regarding the creation of the GPS tracking maps, as further discussed below.

The United States has offered the defendant a stipulation that he was previously convicted of a felony, and that he knew he had been previously convicted of a felony, in accord with *Old Chief* and *Rehaif*, which would satisfy these two

---

[3] For all witnesses the United States expects to call as experts, the United States provided the defense with the Rule 16 notice disclosures and all expert reports, including the entire FBI DNA and Latent Print lab files.

elements and preclude the need for this testimony.[4] The government may also call SA Bujold as a rebuttal witness and/or for impeachment purposes, as needed, concerning other aspects of the investigation and depending upon what the defense may offer by way of cross-examination, evidence and/or testimony, if any.

B. <u>Exhibits</u>

The United States will offer into evidence the recovered firearms, ammunition, and marijuana.[5] The United States will also offer into evidence various photographs of the evidence recovered and seized, and stillshots from the CHS's video-recordings of the interactions with the defendant.

Should the defendant not stipulate to the elements of having been previously convicted of, and knowing he had previously been convicted of, a crime punishable by more than one year in prison, or should the defendant elect to testify, depending on the Court's ruling on the government's motion in limine, the United States will be prepared to offer into evidence certified records of the defendant's prior felony convictions to prove these elements and/or to impeach him should he elect to testify.

C. <u>Expert Testimony</u>

The government plans to offer the testimony of several expert witnesses. First, the government will call ATF Special Agent Nicholas McAdams to testify as an

---

[4] Absent a stipulation, the United States is also prepared to call FBI SA Daniel Skipper, who fingerprinted the defendant following his arrest on February 7, 2024, and a BCA Fingerprint Technician, Tia Yang, who compared those prints, and found that they matched the defendant's prints taken at the time of his other arrests that led to felony convictions.

[5] The firearms will be rendered safe by the FBI with thick plastic zip ties inserted through the chamber and slide and secured to a cardboard gun box. All magazines will be empty—without any ammunition. All efforts will be made to ensure that the firearms are not submitted to the jury at the same time the ammunition is.

interstate nexus expert. Special Agent McAdams will testify that he performed an interstate nexus analysis on the three charged firearms as well as eight different items of ammunition. Special Agent McAdams will testify that none of the charged firearms or ammunition were manufactured in the state of Minnesota, the three charged firearms meet the relevant statutory definition of "firearm" in 18 U.S.C. § 921(a)(3), and the eight charged items of ammunition meet the relevant statutory definition of "ammunition" in 18 U.S.C. § 921(a)(17)(A).

The government will also call FBI Digital Forensic Examiner Vicki Klemz to testify. Ms. Klemz will testify that retrieved, downloaded, and searched Mr. Munsinger's HP laptop and generated a data image of the laptop for access by the FBI case agent. She will also testify about how she generated an Axiom report reflecting certain data retrieved from the defendant's laptop by the case agent.

Next, the government will call BCA chemist Carissa Rootes. Ms. Rootes will testify that she tested approximately two pounds of a green leafy substance seized from Mr. Munsinger's residence and confirmed that it was marihuana with a THC content exceeding 7%.

The government will also call FBI Physical Scientist and Forensic Examiner Erik Carpenter to testify regarding the latent print analysis he conducted in this case. Mr. Carpenter will testify that he tested each of the three charged firearms as well as two additional unserialized firearms seized from Mr. Munsinger's residence for latent prints. Mr. Carpenter developed comparable latent prints from one of the

unserialized firearms and concluded that those prints matched known fingerprints taken from Mr. Munsinger.

FBI Forensic Scientist Mary Fannin will also testify regarding the DNA analysis she performed in this case. She will testify that she developed DNA profiles from swabs taken from the three charged firearms, the two unserialized firearms seized from Mr. Munsinger's residence, and a magazine accompanying one of unserialized firearms.

Ms. Fannin will testify that she was unable to generate any DNA or sex typing results from either of the charged shotguns, meaning she could not perform any comparison on those firearms. However, as to the Ruger Security-9 found in Mr. Munsinger's bedroom, Ms. Fannin will testify that the DNA profile from swabbing the grip of that firearm was interpreted as originating from three individuals. Mr. Munsinger was indicated as a possible contributor—the probability of observing the DNA profile is 14 quadrillion times more likely if a mixture from Mr. Munsinger and two unknown, unrelated people than a mixture of three unknown, unrelated people. The swab from one of the unserialized rifles resulted in a likelihood ratio of 15 quadrillion (very strong support for inclusion), the swab from the magazine resulted in a likelihood ratio of 4.9 trillion (very strong support for inclusion), and the swab from the other unserialized rifle resulted in a likelihood ratio of 52 quadrillion (very strong support for inclusion).

Finally, the government will call BCA Special Agent Michael Flanagan to testify as a drug trafficking expert. Special Agent Flanagan will testify that the

amount of marijuana seized at Mr. Munsinger's residence (more than five pounds) is a distributable amount of marijuana as opposed to a mere user amount. Special Agent Flanagan will also testify about how marijuana is sourced, packaged, and sold in Minnesota.

## IV. Legal Issues

The United States will file accompanying motions in limine, seeking pretrial Orders from the Court on (a) general trial matters, (b) permitting the introduction of FRE 404(b) evidence based on the defendant's prior state felony drug convictions, for the limited purposes of showing knowledge, intent, and motive to possess with intent to distribute marijuana,[6] (c) to prelcude an entrapment defense and (d) to preclude a selective prosecution defense. The United States highlights below the legal bases for the admission of certain testimony and evidence referenced above.

### A. Admissibility of investigation background to provide necessary context

As noted above, the United States will offer testimony and evidence about the investigation into Mr. Munsinger, including evidence about Mr. Munsinger's affiliation with AFN. This evidence is necessary for the jury to understand the context of why law enforcement first began investigating Mr. Munsinger and how law enforcement gathered additional evidence of Mr. Munsinger's unlawful possession of firearms and ammunition as well as his possession with the intent to distribute marihuana. This evidence is relevant, highly probative, and explains to the jury the

---

[6] The United States provided the defense with advanced written notice of its intent to introduce 404(b) and the intended limited purposes.

underlying circumstances of what occurred and, more importantly, the context of why and how law enforcement encountered and investigated Mr. Munsinger. Evidence about AFN is therefore essential to understand why the FBI's investigation of Mr. Munsinger proceeded as it did.

Such evidence is not "extrinsic" FRE 404(b) evidence, but rather part of the *res gestae* of the crime charged in the Indictment. *See United States v. Morrison*, 748 F.3d 811, 812 (8th Cir. 2014) (recognizing that scope of relevant evidence under FRE 401 includes "evidence 'providing the context in which the crime occurred, i.e. The *res gestae*.'"). While evidence of other crimes or bad acts committed by a defendant is generally inadmissible, "one of the exceptions to the general rule permits the introduction of evidence of other criminal activity for the purpose of providing the context in which the crime occurred, i.e., the *res gestae*." *United States v. Moore*, 735 F.2d 289, 292 (8th Cir. 1984); *United States v. LaDue*, 561 F.3d 855, 857 (8th Cir. 2009) (noting that without an understanding of the nature of the call to which police responded, "the jury could [be] confused or misled by a seeming overreaction . . . .").

"A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *Moore*, 735 F.2d at 292. Accordingly, "[w]hen 'evidence of other crimes . . . Tends logically to prove any element of the crime charged . . . it is admissible as an integral part of the immediate context of the crime charged" and therefore not extrinsic evidence governed by Rule 404(b). *United States v. Battle*, 774 F.3d 504, 511 (8th

Cir. 2014) (quoting *United States v. Bass*, 794 F.2d 1305, 1312 (8th Cir.), *cert. denied*, 479 U.S. 869 (1986)); *Morrison*, 748 F.3d at 812 (noting that even when *res gestae* evidence implicates the defendant in other acts, "where acts are inextricably intertwined with the charged crime, they are not extrinsic" and not governed by Rule 404(b)). *See United States v. Maxwell*, 643 F.3d 1096, 1100 (8th Cir. 2011) (holding that Rule 404(b) "does not extend to evidence of acts which are 'intrinsic' to the charged offense . . . because such acts are not truly separate bad acts that show propensity, but are intrinsic evidence which is inextricably intertwined with the crime charged"); *see also United States v. O'Dell*, 204 F.3d 829, 833 (8th Cir. 2000) (noting "firmly established" case law that "Rule 404(b) does not apply" to non-extrinsic "crimes or acts which are 'inextricably intertwined' with the charged crime").

It is not realistic for the government to present its case without briefly discussing AFN. This evidence is an important contextual explanation for how and why the investigation of Mr. Munsinger developed as it did, and the Court should admit it as intrinsic to the offenses charged. The government would also have no objection to the Court instructing the jury that it must not convict Mr. Munsinger merely because his affiliation with AFN or any views the defendant or members of AFN may hold.

B. <u>Introduction of Select Audio and Video Recordings of the Defendant</u>

The United States intends to offer into evidence at trial various audio and video excerpts recorded by the CHS that depict Mr. Munsinger discussing his criminal

history, firearms, ammunition, and marihuana trafficking. These recordings will be admitted through the CHS who recorded them and to whom Mr. Munsinger's statements were made.

The defendant's own statements in these excerpts are not hearsay under FRE 801(d)(2)(A) because they are statements of a party opponent. Likewise, the statements of the CHS are not hearsay because they are not declarative, assertive statements subject to the hearsay rule, and they are offered—not for the truth of the matter—but rather to provide context for the defendant's own statements. *See United States v. Lamm*, 5 F.4th 942, 948 (8th Cir. 2021) ("When out-of-court statements are not offered for their truth, but instead to provide context for certain responses, they are not hearsay."); *United States v. Spencer*, 592 F.3d 866, 879 (8th Cir. 2010) ("Statements providing context for other admissible statements are not hearsay because they are not offered for their truth."). The CHS's statements will also be offered to show their affect on the listener, *i.e.*, Mr. Munsinger. *See United States v. Wright*, 739 F.3d 1160, 1170 (8th Cir. 2014) ("[A] statements offered to show its effect on the listener is not hearsay.").

C. Map Exhibits

To facilitate the jury's understanding of the investigation, and after introducing the data associated with the GPS tracker placed on the Defendant's vehicle, the government will use GPS map exhibits reflecting certain data points obtained by the GPS tracker on January 27, 2024 (the second shooting day), February 2, 2024, and February 3, 2024. Each map will depict data points obtained from

15

the GPS tracker, combining the location of the GPS tracker by latitude, longitude, and approximate physical address, the date and time of that location, and a visual representation of that location by overhead and street-level mapping of the respective coordinates.

The government will introduce testimony demonstrating each GPS tracking device and requisite software were in good working order and produced accurate results; that GPS technology is reliable, as demonstrated by its routine use in present society; and how physical surveillance of the defendant in each vehicle at the same time the respective GPS devices were monitored corroborated the accuracy of the data obtained from each GPS device. Furthermore, the government will demonstrate how the map exhibits are merely an extrapolation of the data points obtained from the GPS trackers, using readily available software to obtain a physical representation of each location at a particular time – hence providing a physical location for the jury to understand, instead of mere data. *See, e.g., United States v. Espinal-Almeida*, 699 F.3d 588, 611-12 (1st Cir. 2012) (affirming admission of GPS data and map exhibit when government provided evidence through person knowledgeable, trained, and experienced in analyzing GPS devices and mapping software); *see also United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109-1110 (9th Cir. 2015) (affirming trial court's admission of exhibit (over hearsay objection) that was generated from Google Earth mapping program and using data obtained from GPS location device).

These map exhibits are admissible with appropriate foundation and authentication, and they will assist the jury's understanding of the investigation.

D.   Drug Trafficking Expert

As noted above, the government intends to call several expert witnesses, including an expert on drug trafficking. Specifically, the government intends to introduce expert testimony to assist the jurors in understanding aspects of drug trafficking that may be unfamiliar to them. The government has notified the defense of its intention to call BCA Special Agent Michael Flanagan as its primary drug expert in this case. The government intends to offer Special Agent Flanagan's testimony to provide information regarding the nature of the drug trafficking business, including but not limited to the role of currency and firearms in that business, the amount of narcotics that would be considered a "distribution" amount rather than for personal use, and how the illicit marihuana business functions independently of the "legal" marihuana business in various states.

The Eighth Circuit has found that the "business of drug trafficking and the *modus operandi* of drug dealers are matters unfamiliar to jurors." *United States v. Robertson*, 387 F.3d 702, 704 (8th Cir. 2004) (citation omitted). Accordingly, in drug cases, "courts frequently admit expert testimony relating to the *modus operandi* of drug dealers, where the expert witness is a law-enforcement officer whose only qualification is experience in the field. *United States v. Holmes*, 751 F.3d 846, 850 (8th Cir. 2014). Relying on Rule 702 of the Federal Rules of Evidence, which permits testimony from experts with special knowledge, experience, or skills when such testimony can assist jurors in understanding issues that are relevant to a case, courts have commonly accepted the type of expert testimony the government intends to

17

introduce through Special Agent Flanagan because it can help jurors understand the drug trafficking business. *See United States v. Juneau*, No. 19-CR-0274, 2022 WL 872908, at *5–6 (D. Minn. Mar. 24, 2022) (denying motion to exclude Special Agent Flanagan's testimony as a drug trafficking expert); *United States v. McCoy*, No. 20-CR-150, 2022 WL 20101922, at *2 (D. Minn. Feb. 28, 2022) (concluding that Special Agent Flanagan's expert testimony "about the nature of the illegal-drug business was relevant and not unduly prejudicial"); *United States v. Turner*, No. 23-CR-252, 2025 WL 586379, at *3 (D. Minn. Feb. 24, 2025) (denying motion in limine to preclude Special Agent Flanagan's testimony as a drug trafficking expert).

Special Agent Flanagan is well qualified to testify as an expert witness in this case, his testimony is relevant to material issues the jury must decide, and it will greatly aid the jury in understanding the evidence in this case.

Dated:  March 18, 2025           Respectfully submitted,

                                 LISA D. KIRKPATRICK
                                 ACTING UNITED STATES ATTORNEY

                                 /s/ *Benjamin Bejar*
                                 BY: BENJAMIN BEJAR
                                 RAPHAEL B. COBURN
                                 Assistant United States Attorneys

18